**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 3, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

GRIFF G. ARGO,

      Plaintiff - Appellant,

v.

BLUE CROSS AND BLUE SHIELD
OF KANSAS, INC.,

      Defendant - Appellee.

No. 05-3114

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 03-CV-4119-JAR)**

---

Pantaleon Florez, Jr., Topeka, Kansas, for Plaintiff-Appellant.

Alan L. Rupe, Kutak Rock LLP, Wichita, Kansas (Georgina Adami, Kutak Rock
LLP, Wichita Kansas, and Stacy A. Jeffress, Blue Cross and Blue Shield of
Kansas, Topeka, Kansas, with him on the brief), for Defendant-Appellee.

---

Before **MURPHY**, **EBEL**, and **McCONNELL**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

---

This case presents an especially weak Title VII sex discrimination claim. The Plaintiff, Griff Argo, was fired by Blue Cross Blue Shield of Kansas, Inc. ("Blue Cross Blue Shield") following nearly a year of declining performance and disciplinary problems, one day after arriving late for work and failing to complete assigned work. He alleges that his termination was the product of reverse sex discrimination, citing a handful of flirtatious comments by his female supervisor over a period of several years. In the alternative, he alleges that he was terminated in retaliation for his decision to file an internal sex discrimination complaint. Both claims fall painfully short on summary judgment, and we affirm the decision of the district court.

## I. Factual and Procedural Background

Griff Argo started work as an Individual Enrollment Specialist ("IES") for Blue Cross Blue Shield in January 1996. IESs spend 90% of the day on the phone, selling health, dental, and life insurance policies to new and existing customers. Blue Cross Blue Shield sets monthly and annual performance goals for each IES, including a number of individual health and dental policies and a dollar volume of life insurance. The company uses those performance goals as a basis for evaluating its employees. On annual review forms during Mr. Argo's tenure at Blue Cross Blue Shield, between 40% and 60% of the overall rating for an IES depended on the three categories of performance goals.

On January 2, 1996, within his first few weeks of work, Mr. Argo was introduced to Brenda Oliva, who then worked in a different department. They had met socially on a previous occasion, but Mr. Argo did not immediately remember Ms. Oliva's name. According to Mr. Argo, she "kind of chuckled" and said, "'oh, so you're too good to remember my name?'" App. 95PP. He did not consider the comment a "come-on line," but maintains that her "tone of voice . . . impl[ied] a form of attraction, and I have to say sexual harassment." *Id.*

Between 1997 and the beginning of 2002, Mr. Argo's performance ranged from "commendable" to "distinguished." *See* App. 176, 180, 182, 184–85, 187–88. Despite occasional "problems with tardiness" he was praised as "an excellent employee and an asset to the IES team." *Id.* at 175–76. In 1999, Ms. Oliva became Mr. Argo's supervisor. On both his 2000 and 2001 annual reviews, she described Mr. Argo as "a team player," and wrote that she was "glad to have him in my department." *Id.* at 183–84, 187. In December 2001, her monthly Goal Attainment Status report for Mr. Argo was effusive: "You've had a great year. I'm very proud of you. You've made all of your goals for 2001. I look forward in [sic] working with you next year." *Id.* at 118. Mr. Argo alleges that throughout this period he endured a "pattern of sexual harassment," *id.* at 95PP, but cites only a single incident in three years: once, upon seeing Mr. Argo in the office dressed in shorts and a tank top on his way to the gym, Ms. Oliva joked, "Whoa, nice legs." *Id.* at 103.

Beginning in April 2002, Mr. Argo's performance began a steady slide. Ms. Oliva's comments on her monthly reports reveal her increasing anxiety. From April 2002: "You didn't meet your monthly goal on health but since you were up the other three months, you are meeting your health goal year to date. . . . Keep up the good work." *Id.* at 108. From June 2002: "You didn't make your monthly goal for health and life. . . . What can we do to help you meet your monthly goals? Is there anything I can do to help?" *Id.* at 110. From July 2002: "This is your second month you didn't make your monthly goal for health. . . . We need to overcome this. . . . Let's get together and see what we can do." *Id.* at 111. From September 2002: "[Y]ou've had 5 months that you did not make your monthly goal. Can you please share with me what you plan on doing to assure me you will make your 2002 health goal?" *Id.* at 113. From October 2002: "This is your sixth month for not making your monthly goal. . . . Let me know what I can do . . . ." *Id.* at 114. From November 2002: "You did not make your monthly goal for the 7th month this year. You need to start using your time wisely." *Id.* at 115.

During the same period, Mr. Argo's tardiness problems worsened. Since June 2001, Ms. Oliva had required Mr. Argo to send her an email message upon arriving at work, warning him further late starts would result in formal "written probation." *Id.* at 130. On March 28, 2002, she gave him a written warning, admonishing him again for the "consistent amount of the time you were coming

into work after 8:00." *Id.* at 131. She cautioned that "if this continues it will be a performance issue." *Id.* In mid-November 2002, Mr. Argo was caught reading a book at his desk during the work day, and continued reading for fifteen minutes before Ms. Oliva confronted him. Phone records revealed that he had not made a call in fifty-three minutes. The next day Ms. Oliva directed him to call some "old" prospective customers, but he refused. On November 22, she issued a written reprimand "for poor performance, specific to your attitude and not using your time correctly," and a blunt warning: "If your attitude does not improve in 30 days and if directives continue to be ignored then I have no alternative but to terminate you from Blue Cross Blue Shield of Kansas." *Id.* at 136.

Meanwhile, Ms. Oliva's campaign of exceedingly mild flirtation continued. On one occasion in July 2002, after monitoring one of Mr. Argo's calls and offering constructive criticism, Ms. Oliva smiled and winked at him. Two months later, Ms. Oliva gave him a birthday card—helpfully reproduced for us in full color by the parties—featuring a picture of a buxom woman dressed in black lingerie. The cover says, "A Birthday Riddle / Why do men like women in leather?" Inside, it continues, "Because they smell like a new car! / Happy Birthday, Guy." *Id.* at 162–63. The joke, you see, is that the sexually suggestive setup is followed by a completely nonsexual punch line. Finally, while he was being reprimanded on November 22 for his time management and attitude problems, Mr. Argo says that Ms. Oliva placed "the tip of her shoe slightly over

the tip of [his] shoe," making him feel "slightly awkward," and did so a second time after he moved his foot away. *Id.* at 102.

Despite repeated warnings, Mr. Argo failed to meet his performance goal for health insurance in 2002. In her December 2002 monthly report, Ms. Oliva noted that he had missed his performance goals for eight consecutive months, and said, "We need to look at 2003 and see what you can do differently so we don't have a repeat of this year." *Id.* at 116. On January 2, 2003, Mr. Argo called in sick at 9:10 am, more than an hour after he was expected at work. The next day, in a written memorandum entitled "Performance," Ms. Oliva reminded Mr. Argo of his earlier warnings regarding tardiness and said, "This is your *last* warning. If you continue to not follow company or departmental policies which include but are not limited to tardiness, time utilization, not following directives, not calling in prior to 8:30 AM, etc., we will have no alternative but to terminate your employment at Blue Cross and Blue Shield of Kansas." *Id.* at 138.

Three days later, on January 6, Mr. Argo filed an internal complaint "regarding a persistent and increasing hostile work environment that I have endured for several months as a result of the conduct of the manager of individual sales, Brenda Oliva." *Id.* at 102. The complaint described the handful of incidents of "sexual harassment" he had endured at the hands of Ms. Oliva, including the birthday card, the shoe tip touching, the wink, and the comments "Whoa, nice legs" and "Oh, so you're too good to remember my name?" *Id.* at

102–03.  These incidents, according to the complaint, "exemplif[y] [Ms. Oliva's] objectification of men in general and her concentration on me in particular as an object of attraction."  *Id.* at 103.  Later Mr. Argo added vague allegations of a "male/female control thing."  *Id.* at 151.  He told the company that he "dread[ed] coming to work" and felt "miserable sometimes in not wanting to come to work to face Brenda."  *Id.* at 152.  To remedy the situation, he asked for a transfer to a different supervisor and for "[m]y write-ups to be removed from my file."  *Id.* at 154.  For her part, Ms. Oliva reacted with "[t]otal shock."  *Id.* at 157.  She denied touching Mr. Argo's foot, and did not remember saying "nice legs" to him years earlier.  *Id.* at 157, 161.  She acknowledged that the birthday card "was probably inappropriate," but explained that she thought "he would only see the humor in it."  *Id.* at 161.  Asked to speculate as to why Mr. Argo would accuse her of sexual harassment, she said, "[b]ecause I have written him up."  *Id.* at 157.

An internal company investigation commenced immediately, but "was not able to substantiate anything" and ended on January 20, 2003.  *Id.* at 161.  Apparently Ms. Oliva received counseling from her manager "on what is appropriate behavior for someone in a management position," but the company took no other official action.  *Id.*

Mr. Argo missed all three of his monthly targets for January 2003.  On her monthly report, dated January 21, Ms. Oliva issued an ultimatum: "If you do not met [sic] your February and March monthly goal[s] you will be terminated from

Blue Cross Blue Shield of Kansas 3-7-03." *Id.* at 129. On January 29, Mr. Argo arrived late for work and failed to work on "old leads" as directed. The next day, January 30, he was fired. A memorandum describing the decision cited the infractions of January 29 as the precipitating events. As he left the office after packing his belongings, Mr. Argo told a co-worker, "you know what this is about." *Id.*

Mr. Argo filed a lawsuit against Blue Cross Blue Shield in federal court, alleging reverse sex discrimination and retaliation under Title VII. During his deposition, counsel for Blue Cross Blue Shield pressed Mr. Argo to explain why he believed his termination was the product of discrimination "because of . . . sex" as required under 42 U.S.C. § 2000e-2(a)(1). When asked if any other IESs, male or female, "ever had that difficulty with the job and either quit or [were] fired," Mr. Argo replied, "There could have been, and I don't recall specifically any one person. There – it – it is possible, yeah." App. 95H. Asked whether any other IESs were fired for poor performance with respect to their sales goals, Mr. Argo replied, "I don't recall . . . it could very well have happened." *Id.* at 95I.

Blue Cross Blue Shield moved for summary judgment, noting that there was no evidence in the record to suggest that female IESs received preferential treatment. In response, Mr. Argo filed an affidavit stating, in paragraph 21, that "[n]o female Individual Enrollment Specialists was [sic] terminated during my employment for failing to make monthly or yearly goals." *Id.* at 269. The

affidavit recited that Mr. Argo was "personally familiar with the matters contained within this affidavit." *Id.* at 267. The district court struck paragraph 21 of the affidavit, disregarding it "as a self-serving, sham affidavit," calculated to manufacture a "sham" issue of fact. *Id.* at 305–07, 317. Specifically, the court found that paragraph 21 "could not be based on personal knowledge" and that it "contradicts his deposition testimony." *Id.* at 317. With no other evidence to support a claim of reverse sex discrimination, the district court held that Mr. Argo had failed to establish a prima facie case. As to the retaliation claim, the district court found that Blue Cross Blue Shield had "easily" satisfied its burden to articulate a legitimate, nondiscriminatory reason for the termination, and that Mr. Argo had failed to establish that its reasons were pretextual. Accordingly, the district court granted summary judgment for Blue Cross Blue Shield on both claims.

Mr. Argo now appeals, not only from the summary judgment rulings but also from the district court's decision to strike paragraph 21 from the affidavit and to disregard that evidence.

## II. Discussion

We review a district court's decision granting summary judgment *de novo*, resolving all factual disputes and drawing all reasonable inferences in favor of the non-moving party. *Fuerschbach v. S.W. Airlines Co.*, 439 F.3d 1197, 1207 (10th Cir. 2006). Summary judgment is warranted only "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

At the summary judgment stage, evidence need not be submitted "in a form that would be admissible at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Parties may, for example, submit affidavits in support of summary judgment, despite the fact that affidavits are often inadmissible at trial as hearsay, on the theory that the evidence may ultimately be presented at trial in an admissible form. *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). Nonetheless, "the content or substance of the evidence must be admissible." *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir. 1995). Thus, for example, at summary judgment courts should disregard inadmissible hearsay statements *contained* in affidavits, as those statements could not be presented at trial in any form. *See Hardy v. S.F. Phosphates Ltd. Co.*, 185 F.3d 1076, 1082 n.5 (10th Cir. 1999). The requirement that the substance of the evidence must be admissible is not only explicit in Rule 56, which provides that "[s]upporting and opposing affidavits shall . . . set forth such facts as would be admissible in evidence," Fed. R. Civ. P. 56(e), but also implicit in the court's role at the summary judgment stage. To determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury. *See Truck Ins. Exch. v. MagneTek,*

*Inc.*, 360 F.3d 1206, 1216 (10th Cir. 2004) (affirming summary judgment, in light of the available evidence, because "[j]ury verdicts may not be based on speculation or inadmissible evidence or be contrary to uncontested admissible evidence"). We review a district court's evidentiary rulings at the summary judgment stage for abuse of discretion. *Jones v. Barnhart*, 349 F.3d 1260, 1270 (10th Cir. 2003).

## A. Paragraph 21 of Mr. Argo's Affidavit

As an initial matter, Mr. Argo appeals from the district court's decision to strike and disregard paragraph 21 of his affidavit opposing summary judgment, which reads: "No female Individual Enrollment Specialists [sic] was terminated during my employment for failing to make monthly or yearly goals." App. 269. The district court cited three related grounds for disregarding paragraph 21: (1) that a "self-serving affidavit" is insufficient to create a genuine issue of material fact on summary judgment; (2) that paragraph 21 contradicts Mr. Argo's deposition testimony and attempts to create a "sham fact issue"; and (3) that the allegations of paragraph 21 are not based on personal knowledge. App. 305–07. We focus on the district court's third reason for excluding paragraph 21.

In finding that the allegations were not based on personal knowledge, the district court relied on District of Kansas Rule 56.1(d), which requires that "[a]ffidavits or declarations shall be made on personal knowledge," but it might just as easily have relied on Rule 56(e) of the Federal Rules of Civil Procedure,

which requires that "[s]upporting and opposing affidavits shall be made on personal knowledge," or Rule 602 of the Federal Rules of Evidence, which requires that testifying witnesses "ha[ve] personal knowledge of the matter." Under the personal knowledge standard, an affidavit is inadmissible if "'the witness could not have actually perceived or observed that which he testifies to.'" *United States v. Sinclair*, 109 F.3d 1527, 1536 (10th Cir. 1997) (quoting *M.B.A.F.B. Fed. Credit Union v. Cumis Ins. Soc'y, Inc.*, 681 F.2d 930, 932 (4th Cir. 1982)). Accordingly, at the summary judgment stage, "statements of mere belief" in an affidavit must be disregarded. *Tavery v. United States*, 32 F.3d 1423, 1427 n.4 (10th Cir. 1994).

Mr. Argo's affidavit recites in paragraph 1 that he is "personally familiar" with the matters contained in the affidavit based on his "over 7 years of employment with the Defendant, Blue Cross Blue Shield." App. 267. Yet the claim in paragraph 21, that "[n]o female Individual Enrollment Specialists was [sic] terminated during my employment for failing to make monthly or yearly goals," *id.* at 269, requires knowledge about the performance and discipline of every female IES at the company. As a co-worker, and not a human resources official, Mr. Argo simply was not in a position to acquire such comprehensive knowledge. In his deposition, he named only seven female IESs who worked at Blue Cross Blue Shield during his tenure, and he admitted that two of them resigned for reasons he did not fully understand while another may in fact have

been terminated. Moreover, nothing in the record indicates that these women were the only seven females employed by Blue Cross Blue Shield as IESs during the relevant time period. At best, Mr. Argo has personal knowledge that a handful of female IESs, whose performance and disciplinary history he happened to learn through workplace discussions, were not terminated for missing performance goals. He may well believe the different, stronger claim in paragraph 21 of the affidavit, but his personal knowledge does not extend so far.[1] In fact, his deposition testimony acknowledges as much: asked directly whether there could have been IESs, male or female, who were fired for performance problems, Mr. Argo said, "There could have been . . . . [I]t is possible, yeah." *Id.* at 95H. The district court therefore did not abuse its discretion in striking and disregarding paragraph 21 of the affidavit for purposes of summary judgment.

**B. Mr. Argo's Reverse Sex Discrimination Claim**

Mr. Argo's principal claim is that his termination was the product of reverse sex discrimination, in violation of Title VII. *See* 42 U.S.C. § 2000e-2(a)(1) (making it an unlawful employment practice for an employer "to discharge any individual . . . because of such individual's . . . sex"). Under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973),

---

[1]In his opening brief, Mr. Argo also argues that "a factual basis for his knowledge exists by virtue of his present sense impression," Br. of Appellant 24, a statement that betrays grave misunderstanding of the personal knowledge requirement, the hearsay exception for present sense impressions, or both.

the plaintiff bears the initial burden of establishing a prima facie case of sex discrimination, whereupon the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the discharge, and then back to the plaintiff to show that the stated reason is pretextual. To establish a prima facie case, a plaintiff ordinarily must show "that (1) the plaintiff belongs to some protected class, (2) the plaintiff was qualified for the position or benefit at issue, (3) the plaintiff suffered an adverse employment action, and (4) the plaintiff was treated less favorably than others (e.g., the position at issue remained open after the adverse employment action)." *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1134 (10th Cir. 2004). The Supreme Court has held that such a prima facie case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on consideration of impermissible factors." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978). For most plaintiffs, establishing a prima facie case is perfunctory, and liability turns on whether the defendant's stated explanation for the adverse employment action is pretextual.

In a reverse discrimination case, however, a prima facie case of discrimination requires a stronger showing. We have held that a plaintiff alleging reverse discrimination "must, in lieu of showing that he belongs to a protected group, establish background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the

majority." *Notari v. Denver Water Dep't*, 971 F.2d 585, 589 (10th Cir. 1992).

Alternatively, a plaintiff may produce facts "sufficient to support a reasonable inference that but for plaintiff's status the challenged decision would not have occurred." *Id.* at 590. We recently reaffirmed *Notari*, notwithstanding the Supreme Court's decisions in *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998), and *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000). *See Mattioda v. White*, 323 F.3d 1288, 1293 (10th Cir. 2003).

Mr. Argo has failed to establish any circumstances that might justify a presumption of reverse sex discrimination. By all accounts, Blue Cross Blue Shield hired plenty of men as IESs, and Mr. Argo has introduced not a whit of statistical or even anecdotal evidence that men suffered adverse treatment as a class in the workplace. Also, although he appears to have been well-qualified for the job, at least before his performance began to decline in April 2002, Mr. Argo has produced no evidence suggesting that the position remained open or that he was replaced by a woman. These circumstances do not support an inference that Blue Cross Blue Shield has taken the "unusual" step of discriminating against men. Nor has Mr. Argo made a sufficient showing that, but for his sex, he would not have been terminated. Ms. Oliva's actions—two flirtatious comments, a mock-bawdy birthday card, and an incident of toe-touching—were incredibly mild. Even viewed in the light most favorable to Mr. Argo, they represent precisely the kind of "ordinary socializing in the workplace" and "intersexual flirtation" about which

Title VII is unconcerned. *See Oncale*, 523 U.S. at 81. Moreover, nothing in the record suggests a temporal or causal connection between Ms. Oliva's alleged flirtation and the termination decision. Even if we assume Ms. Oliva's conduct manifested an inappropriately sex discriminatory attitude toward Mr. Argo, those incidents began long before Mr. Argo's troubles, at a time when Ms. Oliva's job evaluations of Mr. Argo were effusive, and did not change or intensify as his work performance deteriorated and evaluations soured. In this case, there was no *post hoc* to which we could attach a *propter hoc*.

Because Mr. Argo has failed to establish a prima facie case of reverse sex discrimination, we affirm the district court's decision granting summary judgment to Blue Cross Blue Shield.

### C.  Mr. Argo's Retaliation Claim

Finally, Mr. Argo argues that summary judgment was inappropriate on his retaliation claim, again invoking the *McDonnell Douglas* burden-shifting framework. To establish a prima facie case of retaliation, a plaintiff must demonstrate (1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse,[2] and (3) that a causal connection existed between the protected activity

---

[2]This Court had previously held that a prima facie case of retaliation under Title VII requires an "adverse employment action," but the Supreme Court recently rejected that standard. *See Burlington N. & Santa Fe Ry. Co. v. White*, — U.S. —, 2006 WL 1698953, at *10 (June 22, 2006). Instead, to prevail on a Title VII retaliation claim, a plaintiff need only show "that a reasonable employee

and the materially adverse action. *Burlington N. & Santa Fe Ry. Co. v. White*, —

U.S. —, 2006 WL 1698953, at *10 (June 22, 2006); *Miller v. Auto. Club of N.M.,

Inc.*, 420 F.3d 1098, 1119 (10th Cir. 2005). Notably, these requirements do not

change when a plaintiff's underlying opposition is to reverse discrimination—for

example, discrimination against men as a class. Title VII makes reverse

discrimination unlawful, and employers have no more freedom to retaliate against

those who oppose reverse discrimination than any other form of discrimination.

Mr. Argo easily satisfies the requirements of a prima facie case of

retaliation. On January 6, 2003, he filed an internal grievance alleging sexual

harassment by his female supervisor, which certainly qualifies as protected

opposition to discrimination under Title VII. On January 30 he was fired, which

obviously qualifies as "materially adverse" in the sense that it might have

dissuaded a reasonable employee from making the complaint. The close temporal

proximity between the complaint and the termination—just 24 days—is sufficient

to allow an inference that a causal connection existed between the internal

grievance and the decision to terminate Mr. Argo. *See Anderson v. Coors Brewing

Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (indicating that a period of six weeks

---

would have found the challenged action materially adverse, 'which in this context
means it well might have "dissuaded a reasonable worker from making or
supporting a charge of discrimination."'" *Id.* (quoting *Rochon v. Gonzales*, 438
F.3d 1211, 1219 (D.C. Cir. 2006) (quoting *Washington v. Ill. Dep't of Revenue*,
420 F.3d 658, 662 (7th Cir. 2005))).

gives rise to a rebuttable inference of a causal connection, but that a period of three months does not).

The burden therefore shifts to Blue Cross Blue Shield to articulate a legitimate, nondiscriminatory reason for the discharge. The company offers two reasons. First, Mr. Argo's performance had steadily declined for nearly a year, as demonstrated by his failure to meet one or more performance goals for nine consecutive months as well as his annual goal for health policies in 2002. Second, Mr. Argo had received repeated warnings about his tardiness and "attitude" problems, but persisted in arriving late, misusing his time, and failing to perform work as directed. Both are legitimate, nondiscriminatory reasons for the termination, and the burden shifts back to Mr. Argo to demonstrate that the proffered explanation is a pretext for retaliation.

To show pretext, Mr. Argo must produce evidence of "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quoting *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951–52 (3d Cir. 1996)). Mr. Argo does not dispute that he missed a string of performance goals and had frequent disciplinary problems, especially tardiness. Instead, he emphasizes two facts: (1) the timing of his termination, just

24 days after he filed his grievance and 10 days after the internal investigation ended; and (2) the nature of his performance problems, which he characterizes as modest.

First, Mr. Argo contends that the timing of the termination, shortly after his filing of an internal complaint, allows a jury to infer that its reasons are pretextual. That argument has some force with respect to Blue Cross Blue Shield's declining-performance rationale. Although he had received warnings concerning his performance goals for months, as late as January 21 Ms. Oliva was inclined to give Mr. Argo more time for improvement: "If you do not met [sic] your February and March monthly goal[s] you will be terminated from Blue Cross Blue Shield of Kansas 3-7-03." App. 129. If there had been no intervening events, Blue Cross Blue Shield's decision to terminate Mr. Argo on January 30 instead of waiting until March 7 might indeed have suggested pretext.

The timing argument is undermined, however, by the fact that Mr. Argo arrived late for work on January 29, and once again failed to work on "old leads" as directed. Mr. Argo was fired the next morning, January 30. These intervening events defeat any inference of retaliation because the company's concerns about tardiness and "attitude" obviously predate Mr. Argo's internal complaint. Ms. Oliva's January 2 "Performance" memorandum issued a "*last* warning" for "tardiness, time utilization, [and] not following directives," and specifically threatened termination for future infractions. *Id.* at 138. Thus, the timing of the

termination actually cuts against a finding of pretext by strongly suggesting that Blue Cross Blue Shield acted in response to specific and continuing disciplinary problems.

Second, Mr. Argo argues that his performance problems in fact were not serious. He concedes that he missed his health performance goal for 2002, but notes that he exceeded other performance goals, and calculates that he would have received at least an 83.75% overall evaluation on his 2002 annual review—"within the expected range of overall performance levels." Br. of Appellant 22–24. Yet Title VII charges neither this Court nor the jury to act as a "'super personnel department' that second guesses employers' business judgments." *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir. 1999). Blue Cross Blue Shield is free to conclude that a long series of missed goals in one area justifies termination, notwithstanding adequate or even strong performance in other areas. In any case, Mr. Argo has no answer to the charge that he repeatedly arrived late for work and failed to perform tasks as directed.[3] Such behavior immediately preceded his termination, and was cited by the company in internal documents describing the decision. Under the

---

[3]To the surprise of the Court and opposing counsel, Mr. Argo's attorney claimed at oral argument that a factual dispute exists as to whether Mr. Argo was late for work on January 29. A thorough review of the record reveals no such factual disagreement, and we base our decision on the uncontested documents produced by Blue Cross Blue Shield describing Mr. Argo's tardiness that day.

circumstances, no reasonable jury could conclude that Mr. Argo's termination was retaliatory.

Because Mr. Argo has failed to raise a genuine issue of material fact as to whether Blue Cross Blue Shield's stated reasons for the termination are a pretext for retaliation, we affirm the decision of the district court.

### III. Conclusion

For the foregoing reasons, we **AFFIRM** the decision of the district court in all respects.