**FILED**
**United States Court of Appeals**
**Tenth Circuit**

## UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

**November 30, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

_____

WENDY L. PAINTER,

    Plaintiff - Appellant,

v.

MIDWEST HEALTH, INC.; PIONEER
RIDGE NURSING FACILITY
OPERATIONS, LLC, d/b/a Pioneer Ridge
Health & Rehab,

    Defendants - Appellees.

No. 21-3195
(D.C. No. 2:19-CV-02336-DDC)
(D. Kan.)

_____

### ORDER AND JUDGMENT[*]

_____

Before **PHILLIPS**, **McHUGH**, and **ROSSMAN**, Circuit Judges.

_____

Wendy L. Painter appeals from the district court's grant of summary judgment

to her former employer, Pioneer Ridge Nursing Facility Operations, LLC (Pioneer).

Ms. Painter had brought employment claims alleging reverse race discrimination and

retaliation under Title VII, 42 U.S.C. §§ 2000e-2(a)(1) & 2000e-3(a), and 42 U.S.C.

§ 1981, as well as tortious interference with prospective contractual relationships or

---

[*] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

expectancies and blacklisting under Kansas law. In addition to appealing the district court's summary judgment order, Ms. Painter moves to certify questions of state law to the Kansas Supreme Court. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the district court's judgment and deny the motion for certification.[1]

I

Pioneer is an assisted-living nursing facility. Ms. Painter, who identifies as Caucasian, was hired by Pioneer in 2006 as a licensed practical nurse. During her tenure, she received several disciplinary warnings, including one on March 7, 2017, for failing to assess a resident's skin condition. Pioneer asserted this infraction "caused potential harm to a resident" for which it was fined more than $24,000. Aplt. App., vol. II at 99.

Sometime at the end of 2016 or in early 2017, Ms. Painter spoke to Pioneer's administrator, Ann Bell, who also identifies as Caucasian. Ms. Painter was frustrated with her job and felt she was being "questioned about [her] job performance" by the director of nursing, Kathleen King-Alvoid, who identifies as African-American. *Id.*, vol. I at 101. Ms. Painter complained that while other nurses made errors and were insubordinate with impunity, Ms. King-Alvoid reprimanded her for eating a cookie at

---

[1] Ms. Painter named Midwest Health, Inc., as a defendant, but the district court concluded that she failed to establish a triable issue showing that Midwest Health was her employer, and consequently, she could not prevail on her Title VII and § 1981 claims against Midwest Health. Ms. Painter does not challenge the district court's grant of summary judgment to Midwest Health on those claims. *See* Aplt. Opening Br. at 6. To the extent Ms. Painter advances her state-law claims against Midwest Health, we consider them in conjunction with our discussion of those claims against Pioneer.

the nurse's station while another nurse was allowed to eat "a sucker at the nurse's station." *Id.*

Ms. Painter spoke to Ms. Bell a second time in October 2017, complaining that she felt "picked on" and that her job performance was being questioned on a daily basis. *Id.* at 102. She told Ms. Bell she was denied time off, had to find coverage when she was absent, and was "treated unfairly." *Id.* at 103. Ms. Painter explained that she was always assigned to the Rapid Recovery Unit (RRU), where residents recovered following surgery or severe illness. She felt it was "belittling" to be assigned to the RRU, where her primary responsibility was to "pass[] the medications and provide[] treatment," because she was "a nurse, not a medication passer." *Id.*, vol. II at 76-77. Ms. Painter told Ms. Bell she felt "it was somewhat discriminating how [she] was being treated differently than other nurses." *Id.* at 75.

On February 16, 2018, Ms. Painter was involved in an argument with a resident's son, who accused her of failing to take the resident's vitals. During the argument, "both [Ms.] Painter and [the] resident's son raised their voices." *Id.*, vol. I at 30, ¶ 5. Ms. Painter's direct supervisor, Debbie Garrett, took the resident's vitals and determined he had low oxygen levels. The resident was transported to a hospital where he was diagnosed with sepsis.

"As a result of the resident's condition and [Ms.] Painter's acknowledgment of an argument with the resident's son, and Pioneer['s] . . . belief that [Ms.] Painter refused to take the resident's vital signs, Pioneer . . . reported an Allegation of Neglect to [the] Kansas Department of Aging and Disability Services ('KDADS')."

3

*Id.*, ¶ 6. Pioneer was obligated to report the allegation of abuse or neglect to KDADS. *See id.* at 134 (King-Alvoid depo.) (testifying that "anytime" there is an allegation of abuse or neglect, "it's merely the allegation that triggers the process" for Pioneer to report it to KDADS, and "it doesn't matter if at that time it's been substantiated or determined[] that it was an actual claim of abuse or neglect"); *id.* at 139 (Vogel, vice-president of skilled nursing, depo.) (testifying that reporting allegations of abuse, neglect, or exploitation to KDADS is "an absolute mandate").

Pioneer suspended Ms. Painter while it investigated the incident. On February 22, 2018, Pioneer reported its findings to KDADS. It found "that there was no neglect to the resident and that the changes in the resident's condition were [timely] assessed and addressed," but that Ms. Painter was terminated "for failing to meet a family member's reasonable request." *Id.* at 30, ¶¶ 9-10. That same day, February 22, 2018, Ms. Bell notified Ms. Painter she was terminated because she "neglected patient care duties related to the health and physical comfort of a resident when she failed to follow a reasonable request from a family member related to the care of his father and when she conducted herself unprofessionally in a manner that adversely [a]ffected the facility." *Id.*, ¶ 12 (internal quotation marks omitted).

KDADS independently investigated and proposed to find Ms. Painter's actions constituted abuse and neglect as defined by state law. KDADS sent Ms. Painter a "Notice of Finding of Abuse and Neglect." *Id.*, vol. III at 74. The notice gave her an opportunity to challenge the proposed finding and informed her that federal law prohibits nursing facilities from employing individuals with such findings entered

4

into the state registry concerning abuse and neglect. But Ms. Painter did not receive the notice until months later because it was sent to an outdated address listed on Pioneer's records. Ms. Painter eventually sought judicial review of KDADS' proposed finding of abuse and neglect in a Kansas state court, which determined the proposed finding was not a final decision because Ms. Painter was not properly served.

Based on these events, Ms. Painter filed this action, claiming reverse race discrimination and retaliation under Title VII and § 1981. She also asserted state-law claims for tortious interference with prospective contractual relationships or expectancies and blacklisting. The district court granted summary judgment to Pioneer on all claims, and Ms. Painter appealed.

## II

"We review the district court's summary-judgment order de novo, applying the same standard that the district court is to apply." *Singh v. Cordle*, 936 F.3d 1022, 1037 (10th Cir. 2019). "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 997 (10th Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). Under this standard, we "view facts in the light most favorable to the non-moving party and draw all reasonable inferences in her favor." *DeWitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1306 (10th Cir. 2017) (brackets, ellipsis, and internal quotation marks omitted).

5

"[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). But the nonmoving "party must identify sufficient evidence which would require submission of the case to a jury," meaning she "must make a showing sufficient to establish an inference of the existence of each element essential to the case." *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1402 (10th Cir. 1997) (internal quotation marks omitted). "Mere allegations . . . are insufficient to survive a motion for summary judgment." *Stover v. Martinez*, 382 F.3d 1064, 1070 (10th Cir. 2004).

### A. Reverse Race Discrimination under Title VII and § 1981

We first consider Ms. Painter's claims of reverse race discrimination, which are premised solely on her termination. The analysis for these claims under Title VII and § 1981 is the same; because Ms. Painter can point to no direct evidence of discrimination, it requires her to make out a prima facie case under the *McDonnell-Douglas* burden-shifting framework.[2] *See Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 & n.4 (10th Cir. 2000). If the plaintiff "establish[es] a prima facie case of . . . discrimination, . . . the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the discharge, and then back to the plaintiff to show that the stated reason is pretextual." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1201 (10th Cir. 2006). Ordinarily, to establish a prima

---

[2] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).

facie case, a plaintiff must "show that (1) [s]he belongs to a protected class; (2) [s]he was qualified for [her] job; (3) despite [her] qualifications, [s]he was discharged; and (4) the job was not eliminated after [her] discharge." *Singh*, 936 F.3d at 1037 (internal quotation marks omitted).

However, where, as here, a plaintiff alleges reverse discrimination, "a prima facie case of discrimination requires a stronger showing." *Argo*, 452 F.3d at 1201. In a reverse discrimination case, a plaintiff "must, in lieu of showing that [s]he belongs to a protected group, establish background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority." *Id.* (internal quotation marks omitted). "Alternatively, a plaintiff may produce facts sufficient to support a reasonable inference that but for plaintiff's status the challenged decision would not have occurred." *Id.* (internal quotation marks omitted). This alternative formulation of the prima facie case requires a plaintiff to "allege and produce evidence to support specific facts that are sufficient to support a reasonable inference that but for plaintiff's status the challenged decision would not have occurred." *Notari v. Denver Water Dep't*, 971 F.2d 585, 590 (10th Cir. 1992). "[I]t is not enough, under this alternative formulation, for a plaintiff merely to allege that [s]he was qualified and that someone with different characteristics was the beneficiary of the challenged employment decision." *Id.*

Ms. Painter attempts to satisfy this latter alternative formulation of the prima facie test by repeating her contention, which the district court rejected, that Ms. King-Alvoid, who is African-American,

> showed favoritism toward Black, African-American and African employees who were similarly situated to Plaintiff. That favoritism expressed itself in disparate treatment in time-off requests, requiring the Plaintiff but not the favored employees to find substitutes for time-off requests; and disparity in matters of discipline, resulting in no discipline for the favored employees when they made mistakes or refused assignments, but false allegations against the Plaintiff for her work performance, or nitpicking her performance.

Aplt. Opening Br. at 8.

This contention fails. As the district court explained, Ms. Painter has produced no evidence to support specific facts from which it could be reasonably inferred that but for her status as Caucasian she would not have been fired.[3] Rather, she makes unsupported allegations that Ms. King-Alvoid exhibited favoritism—not by firing similarly situated Caucasians or refusing to discharge similarly situated Black, African-American, or African employees—but by allowing Black, African-American, or African employees time off without requiring them to find coverage during their absences and not disciplining them while Ms. Painter was criticized and nitpicked. Yet none of these things are associated with Ms. Painter's

---

[3] Ms. Painter's opening brief repeats, at times verbatim, her summary judgment arguments. *Compare, e.g.*, Aplt. Opening Br. at 7-8, *with* Aplt. App., vol. II at 43-44. "It thus inherently fails to address in a direct way the decision under review and, as a result, does not effectively come to grips with the district court's analysis of the deficiencies in [her] case." *Semsroth v. City of Wichita*, 555 F.3d 1182, 1186 n.5 (10th Cir. 2009).

8

termination, which is the only employment action she challenges. Thus, her allegations of favoritism for time off and reprimands do not create an inference that but for Ms. Painter's race, she would not have been fired. She therefore fails to satisfy the alternative formulation of her prima facie case.[4]

Further, Pioneer offered a legitimate, non-discriminatory reason for firing Ms. Painter, and she has not produced sufficient evidence to raise a genuine issue of material fact that the proffered reason was pretext for discrimination. Pioneer says it fired Ms. Painter because she "neglected patient care duties related to the health and physical comfort of a resident when she failed to follow a reasonable request from a family member related to the care of his father" and because she "conducted herself unprofessionally in a manner that adversely [a]ffected the facility." Aplt. App., vol. V at 52. She stipulated to that fact. *Id.*, vol. I at 29, 30, ¶ 12. To show pretext, Ms. Painter must "produc[e] evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Sanders v. Sw. Bell Tel., L.P.*, 544 F.3d 1101, 1106 (10th Cir. 2008) (internal quotation marks omitted).

---

[4] Ms. Painter also asserts she can satisfy several elements of the traditional prima facie case, *see* Aplt. Opening Br. at 8-11, but those elements are not applicable here, where she alleged reverse discrimination and attempted to satisfy the alternative formulation of the prima facie case, *see Notari*, 971 F.2d at 590-91.

Ms. Painter attempts to establish a fact issue on pretext by arguing that Pioneer has given inconsistent reasons for terminating her. She cites Pioneer's response to her charge of discrimination filed with the Equal Employment Opportunity Commission (EEOC), where Pioneer stated it "terminated [her] employment for resident neglect" and noted she had previous disciplinary infractions, including the instance of causing "potential harm to a resident" for which Pioneer was fined more than $24,000. Aplt. App., vol. II at 99-100. Ms. Painter characterizes Pioneer's EEOC response as providing multiple distinct reasons for terminating her based on "[v]iolations of work rules, prior violations of policies, . . . incurring a large expense for [Pioneer]," and "resident neglect." Aplt. Opening Br. at 13 (internal quotation marks omitted). But the EEOC response clearly states the reason she was fired was "a family complaint regarding resident neglect." Aplt. App., vol. II at 99; *see also id.* at 100 ("Pioneer . . . terminated Ms. Painter for resident neglect."). Pioneer's reference to her history of other disciplinary infractions was not an inconsistent basis for terminating her; it was a recitation of her previous disciplinary record.

Ms. Painter also contends the reason Pioneer gave for terminating her in its EEOC response—resident neglect—contradicts the reason it gave for terminating her in its report to KDADS, where Pioneer found there was no neglect. But, as Ms. Painter stipulated, Pioneer's report to KDADS was that "there was *no neglect to the resident*" because the resident's condition was assessed and addressed in a timely manner. *Id.*, vol. I at 29, 30, ¶ 9 (emphasis added). The evidence confirms that immediately after the argument between Ms. Painter and the resident's son,

Ms. Painter's supervisor, Ms. Garrett, tended to the resident. *See id.*, vol. II at 105-06 (Garrett investigation statement); *id.* at 110 (Painter investigation statement). Hence, Pioneer reported its belief to KDADS that there was no neglect to the resident. Yet Pioneer also reported to KDADS that Ms. Painter was terminated "for failing to meet a family member's reasonable request." *Id.*, vol. I at 30, ¶ 10. And Ms. Painter stipulated that Pioneer terminated her because she "*neglected patient care duties* related to the health and physical comfort of a resident when *she failed to follow a reasonable request from a family member* related to the care of his father and when she conducted herself unprofessionally in a manner that adversely [a]ffected the facility." *Id.* at 29, 30, ¶ 12 (emphasis added) (internal quotation marks omitted). There is no inconsistency in this evidence, and Ms. Painter fails to establish a fact issue on pretext.[5]

---

[5] Ms. Painter also contends "[s]ome of the stated work rule violations are incoherent," citing as an example that she was disciplined for photographing a resident. Aplt. Opening Br. at 14. But Ms. Painter's claims are premised on her termination, not work-rule violations. Moreover, she attempts to support this argument by citing "Ex. 3 Employee Disciplinary Action Record," *id.*, but she does not provide any specific citation to the record on appeal where we might locate this exhibit. Although the district court referenced "Ex. 3" as "Doc. 81-4," Aplt. App. vol. V at 194, the district court's docket indicates that "Doc. 81-4" is sealed, *see id.*, vol. I at 14. Under these circumstances, we decline to consider this contention any further. *See Burnett v. Sw. Bell Tel., L.P.*, 555 F.3d 906, 908 (10th Cir. 2009) ("[A]n appellant who provides an inadequate record does so at his peril." (internal quotation marks omitted)).

*B. Retaliation under Title VII and § 1981*

We next consider Ms. Painter's retaliation claims under Title VII and § 1981, which, like her previous claims, also employ the same analysis. *See Twigg*, 659 F.3d at 998. To make out a prima facie case of retaliation, Ms. Painter had to show "(1) that she engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Reznik v. inContact, Inc.*, 18 F.4th 1257, 1260 (10th Cir. 2021) (brackets and internal quotation marks omitted). "To establish a causal connection, a plaintiff must present evidence of circumstances that justify an inference of retaliatory motive." *Bekkem v. Wilkie*, 915 F.3d 1258, 1271 (10th Cir. 2019) (internal quotation marks omitted). "If the protected conduct is closely followed by the adverse action, courts have often inferred a causal connection." *Id.* (internal quotation marks omitted). But "we have held that a three-month period, standing alone, is insufficient to establish causation." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999).

Ms. Painter's claims falter on the causation element. She relies on her October 2017 conversation with Ms. Bell to establish that she engaged in protected opposition to discrimination.[6] During that conversation, she complained that she felt "it was

---

[6] In the district court, Ms. Painter also relied on her conversation with Ms. Bell at the end of 2016 or in early 2017 to establish she engaged in protected activity. The district court determined that first conversation was a general, unprotected complaint, not protected activity. *See* Aplt. App., vol. V at 199-200 & n.19.

somewhat discriminating how [she] was being treated differently than other nurses."

Aplt. App., vol. II at 75. As a result, she says she suffered two adverse actions: she

continued to be assigned to the RRU and she was terminated. She failed to establish

causation via her assignments to the RRU, however, because as the district court

correctly recognized, she produced no evidence indicating *when* she was assigned to

the RRU. She contends it was sufficient for her to allege that the assignments to the

RRU "continued after the second complaint" and that the "specific dates of

assignment are not necessary." Aplt. Opening Br. at 18. But absent any indication

how long after her complaint to Ms. Bell she was assigned to the RRU, or any other

supporting evidence to infer a causal connection between her complaint and the

allegedly continuing assignments, Ms. Painter failed to produce sufficient evidence to

justify an inference of retaliatory motive. *See Bekkem*, 915 F.3d at 1271.

As for Ms. Painter's termination, she concedes there was a gap of at least three

months between her October 2017 complaint to Ms. Bell and her February 22, 2018,

termination, which is too long to establish a causal connection by itself. *See Coors*

*Brewing Co.*, 181 F.3d at 1179. Nevertheless, she urges us to consider her continuing

assignments to the RRU in conjunction with her termination to establish causation.

But again, without any indication when those assignments occurred or evidence to

---

Ms. Painter has not adequately challenged that ruling on appeal. *See* Aplt. Opening
Br. at 16-17 (arguing she "presented specific complaints" to Ms. Bell, but discussing
only the second complaint in October 2017); *Bronson v. Swensen*, 500 F.3d 1099,
1104 (10th Cir. 2007) ("[W]e routinely have declined to consider arguments that are
not raised, or are inadequately presented, in an appellant's opening brief.").

infer a retaliatory motive based on her assignments to the RRU, the assignments do not suggest a causal connection between her October 2017 complaint and her termination.  The district court properly granted summary judgment to Pioneer on Ms. Painter's retaliation claims.

### C. Tortious Interference with Prospective Contractual Relationships or Expectancies

Ms. Painter also challenges the district court's grant of summary judgment on her claim for tortious interference.  The district court recognized a claim of tortious interference under Kansas law "'is predicated on malicious conduct by the defendant.'"  Aplt. App., vol. V at 208 (quoting *Dickens v. Snodgrass, Dunlap & Co.*, 872 P.2d 252, 257 (Kan. 1994)).  The district court further observed that Kansas law "describe[s] malice as 'actual evil-mindedness or specific intent to injure.'"  *Id.* (quoting *Turner v. Halliburton Co.*, 722 P.2d 1106, 1113 (Kan. 1986)).  The district court concluded, however, that there was no evidence to create a genuine issue of material fact on the question of malice.  On appeal, Ms. Painter disputes the district court's conclusion, arguing that Pioneer acted with malice by reporting the allegation of abuse or neglect to KDADS and by providing an outdated address for her with its report to KDADS.  She says the outdated address resulted in her not receiving KDADS' proposed finding of abuse and neglect and her being listed as a prohibited person on the state's registry.

Ms. Painter's first argument—that Pioneer demonstrated malice by reporting the allegation of abuse or neglect to KDADS—is unavailing because, as the district

14

court correctly observed, Pioneer "believed it was legally required to report any allegation of abuse or neglect." *Id.* at 212 (citing depositions of Ms. King-Alvoid and Ms. Vogel). Ms. Painter has produced no evidence suggesting otherwise, and no reasonable jury could find malice based on this evidence.

Neither does Pioneer's listing of an outdated address with its report to KDADS suggest malice. Ms. Painter insists the outdated address shows malice because it left her with no knowledge either of KDADS' proposed finding of abuse and neglect or of her being listed as a prohibited person on the state's registry. The problem, however, is that Ms. Painter provides no evidence to support her theory that Pioneer intended that result. *See Aramburu*, 112 F.3d at 1402 ("[T]he party opposing summary judgment . . . must identify sufficient evidence which would require submission of the case to a jury." (internal quotation marks omitted)). To the contrary, the district court noted this theory overlooked that Pioneer's report found "there was no neglect, and that changes in the resident's condition were assessed and addressed timely." Aplt. App., vol. V at 213 (brackets and internal quotation marks omitted). Because the report found there was no abuse or neglect to the resident, the district court concluded that no reasonable jury could infer malice simply because the report also listed an outdated address for Ms. Painter. We agree. Although Ms. Painter contends the district court made improper inferences in Pioneer's favor, the district court merely recognized she failed to produce evidence showing a triable issue on the question of malice. The district court correctly granted summary judgment on the tortious interference claim.

15

*D. Blacklisting*

We now turn to Ms. Painter's claim for civil blacklisting.  We have previously

addressed the Kansas statutory scheme governing blacklisting and concluded that,

"[b]ased on the plain language of [Kan. Stat. Ann. § 44-119], . . . a criminal

blacklisting conviction is an element of a civil blacklisting claim against an employer

under Kansas law." *Anderson v. United Tel. Co. of Kan.*, 933 F.2d 1500, 1503

(10th Cir. 1991).[7]  Ms. Painter acknowledges *Anderson* held that a criminal

blacklisting conviction is required to establish a claim for civil blacklisting.  She also

concedes there was no criminal conviction here.  Nonetheless, she asks us to overrule

---

[7] The Kansas blacklisting statute provides:

> Any employer of labor in this state, after having discharged any person
> from his service, shall not prevent or attempt to prevent by word, sign or
> writing of any kind whatsoever any such discharged employee from
> obtaining employment from any other person, company or corporation,
> except by furnishing in writing, on request, the cause of such discharge.

Kan. Stat. Ann. § 44-117.  The statutory scheme also provides for criminal penalties:

> Any employer of labor, his agent or employee, who shall violate the
> provisions of this act shall be guilty of a misdemeanor, and shall upon
> conviction be fined for each offense the sum of one hundred dollars and
> thirty days' imprisonment in the county jail.

*Id.* § 44-118.  And it provides for civil penalties:

> Any person, firm or corporation *found guilty* of the violation of this act,
> shall be liable to the party injured to an amount equal to three times the
> sum he may be injured, and such employers of labor shall also be liable
> for a reasonable attorney fee, which shall be taxed as part of the costs in
> the case.

*Id.* § 44-119 (emphasis added).

*Anderson* either as incorrectly decided or because there have been statutory developments compelling a different result. Our cases are clear, however: "We cannot overrule the judgment of another panel of this court. We are bound by the precedent of prior panels absent en banc reconsideration or a superseding contrary decision by the Supreme Court." *In re Smith*, 10 F.3d 723, 724 (10th Cir. 1993). *Anderson* is binding precedent, and absent a criminal conviction, Pioneer was entitled to summary judgment on Ms. Painter's claim for civil blacklisting.

III

Finally, we consider Ms. Painter's motion to certify questions of state law to the Kansas Supreme Court. "Whether to certify a question of state law to the state supreme court is within the discretion of the federal court." *Armijo v. Ex Cam, Inc.*, 843 F.2d 406, 407 (10th Cir. 1988). "The federal court should consider state court decisions, decisions of other states, federal decisions, and the general weight and trend of authority." *Id.* "Certification is not to be routinely invoked whenever a federal court is presented with an unsettled question of state law." *Id.*

Ms. Painter seeks to certify two questions to the Kansas Supreme Court: 1) whether the Kansas blacklisting statute, and her claim in particular, is subject to a one-year statute of limitations or a three-year statute of limitations and 2) whether a criminal conviction is an element of a claim for civil blacklisting. *Anderson* already answered the latter question, however, which, at least in this case, obviates any need to consider the former question. We therefore deny the motion for certification.

17

IV

The district court's judgment is affirmed.  Ms. Painter's motion to certify questions of law to the Kansas Supreme Court is denied.

Entered for the Court

Carolyn B. McHugh
Circuit Judge