FILED
United States Court of Appeals
Tenth Circuit

April 16, 2009

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

BETTY J. PINKERTON,

     Plaintiff - Appellant,

v.

COLORADO DEPARTMENT OF
TRANSPORTATION,

     Defendant - Appellee.

No. 07-1494

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 05-cv-01533-MJW-CBS)**

---

David Lane of Killmer, Lane & Newman, L.L.P., Denver, Colorado, for Plaintiff -
Appellant.

Douglas Cox, Assistant Attorney General (John W. Suthers, Attorney General, on
the brief), Denver, Colorado, for Defendant - Appellee.

---

Before **KELLY**, **EBEL**, and **GORSUCH**, Circuit Judges.

---

**KELLY**, Circuit Judge.

---

     Plaintiff-Appellant, Betty Pinkerton, appeals from the grant of summary

judgment in her employment discrimination action. Ms. Pinkerton was employed

by Defendant-Appellee, the Colorado Department of Transportation ("CDOT"),

from April 1995 until her termination on March 27, 2003. Prior to Ms. Pinkerton's termination, her superiors within CDOT had held multiple meetings regarding her sub-standard performance and had sought to have her transferred elsewhere for employment. In addition, a few months before being terminated, Ms. Pinkerton had also been subjected to sexually oriented comments by her male supervisor. In response to her termination, Ms. Pinkerton brought sex discrimination and retaliation claims against CDOT pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"). Following discovery, the district court granted CDOT's motion for summary judgment as to each of Ms. Pinkerton's claims.

On appeal, Ms. Pinkerton makes three major claims which, she argues, requires reversal of the district court order. Ms. Pinkerton contends that (1) the district court incorrectly applied the summary judgment standard by construing evidence and resolving factual issues in favor of the movant; (2) the district court incorrectly applied the concept of vicarious employer liability for sexual harassment and improperly weighed the evidence in doing so; and (3) the district court improperly adjudicated the retaliation claim by ignoring evidence of pretext and resolving contested factual issues. Our jurisdiction arises under 28 U.S.C. § 1291, and we affirm.

## Background

Ms. Pinkerton was hired by CDOT as an Administrative Assistant II ("AA II") in April 1995. From 1995 until 2000, Ms. Pinkerton was supervised by Mr. Scott Ellis. In 2000, CDOT reallocated Ms. Pinkerton's position to AA III, based on the job duties that Ms. Pinkerton performed rather than on the quality of her work in performing those duties. At the same time, CDOT also reassigned the supervision of Ms. Pinkerton from Mr. Ellis to Mr. David Martinez, which pleased Ms. Pinkerton because Mr. Ellis had resisted the reallocation of Ms. Pinkerton's position. Because of Ms. Pinkerton's new job category, she was expected to take on new duties and was provided certain new "Individual Performance Objectives" ("IPOs"). In addition, Ms. Pinkerton was to have "progress meetings" with Mr. Martinez every three weeks. After the transfer, however, Mr. Ellis—who still worked with Ms. Pinkerton—observed a significant decline in Ms. Pinkerton's performance.[1]

This decline is also evident from the evaluations of Ms. Pinkerton that Mr. Martinez provided. In his notes for the August 21, 2000, progress meeting, Mr. Martinez documented a number of issues similar to those reported in the past by

---

[1] Mr. Ellis had rated Ms. Pinkerton's performance as either "good" or "fully competent" throughout the time he supervised her from 1995 to 2000. However, Mr. Ellis also consistently noted that Ms. Pinkerton struggled with maintaining co-worker relations. In his first few reviews, Mr. Ellis also noted problems with the number of errors committed by Ms. Pinkerton.

Mr. Ellis.  Mr. Martinez noted that Ms. Pinkerton lacked a willingness to do requested work, had problems with her attitude and cooperation, failed to properly prioritize assignments, and lacked organizational and grammar skills.  Mr. Martinez's notes from the September 12, 2000, and September 29, 2000, meetings contained similar comments.  Based on these reports, CDOT held an R-6-10[2] meeting to review Ms. Pinkerton's performance.  Mr. Richard Gabel, Mr. Martinez's superior, issued a corrective action for Ms. Pinkerton after finding that she had failed to "carry out certain job duties in a satisfactory manner."  The corrective action identified five performance areas in which Ms. Pinkerton had to improve and warned that failure to improve would result in further disciplinary action.  In April 2001, Mr. Martinez gave Ms. Pinkerton an overall rating of "needs improvement"; again, the report noted Ms. Pinkerton's need to improve working relations, prepare timely and accurate reports, reduce errors, and set priorities.

Ms. Pinkerton's continued poor performance led to another R-6-10 hearing on April 16, 2001; at the hearing, Ms. Karla Harding, CDOT's Regional Director, demoted Ms. Pinkerton to AA II.  Accordingly, Mr. Martinez issued a memorandum on September 7, 2001, setting forth Ms. Pinkerton's new duties as

---

[2] Colorado State Personnel Rule R-6-10 provides for a meeting at which employees are informed of disciplinary charges and given the opportunity to be heard.

an AA II. Ms. Pinkerton filed a grievance regarding the disciplinary action and was granted a hearing. As a result of the hearing, Ms. Pinkerton and CDOT entered into a settlement agreement. The agreement required Ms. Pinkerton to adhere to IPOs reflecting the duties highlighted in the September 7, 2001, memorandum and allowed her a certain number of errors per month in different objective categories. The new IPOs were to be used to evaluate Ms. Pinkerton's performance. Ms. Pinkerton was satisfied with the settlement agreement because it provided an objective basis by which her performance was to be evaluated.

However, Ms. Pinkerton's performance did not improve following the settlement agreement. The monthly progress review meetings revealed that Ms. Pinkerton exceeded the number of errors that she was allowed in multiple categories. Mr. Martinez provided written documentation of the errors, and Ms. Pinkerton acknowledges that a "good number" of her errors were reported by other people to Mr. Martinez. Then, in Ms. Pinkerton's 2002 evaluation, Mr. Martinez gave Ms. Pinkerton an overall rating of "needs improvement." Again, Mr. Gabel issued a corrective action, giving her four months to improve. However, Ms. Pinkerton continued to exceed the number of allowable errors in her monthly progress reviews, as demonstrated by the supporting documentation provided by Mr. Martinez.

On October 15, 2002, as required by the corrective action plan, Mr. Martinez sent Mr. Gabel a memorandum summarizing Ms. Pinkerton's lack of

improvement and tabulating her errors. Knowing that she was in danger of losing her job, Ms. Pinkerton requested a meeting with Mr. Gabel and Ms. Wendy Miller. At the November 7, 2002, meeting, Ms. Pinkerton asked Mr. Gabel for time to look for a new job. Mr. Gabel agreed, and offered to help her look for a new job. Ms. Harding subsequently found a position in Denver that Ms. Pinkerton could have for a trial period.

After the November 7, 2002, meeting, however, Mr. Martinez began making inappropriate, sexually oriented remarks to Ms. Pinkerton. In December, 2002, Mr. Martinez asked Ms. Pinkerton questions such as, "How can you be divorced so long and be without men?" and "Don't you get urges?" Ms. Pinkerton testified that these questions made her feel sick to her stomach. On January 6, 2003, after observing a man walk past Ms. Pinkerton's office and wave to her, Mr. Martinez asked Ms. Pinkerton whether she "ha[d] anything going on with the man that just waved." The same day, Mr. Martinez asked her what her breast size was. On another occasion, Mr. Martinez asked Ms. Pinkerton if she masturbated and if she had breast enlargements. Mr. Martinez also told Ms. Pinkerton that he liked it when she wore skirts and tried to tell her a story about a married woman who "came on" to him. Ms. Pinkerton testified that the last inappropriate comments by Mr. Martinez occurred the week prior to February 21, 2003, when he made comments about her ex-husband and children, and asked to go to her house for lunch.

Ms. Pinkerton called Mr. Eugene Trujillo, CDOT's internal civil rights administrator, to report Mr. Martinez's comments on February 19, 2003. Mr. Trujillo was the first person she informed about the comments. She then filed a formal written complaint on February 24, 2003. Ms. Harding received notice of the complaint on February 26, 2003.

These events were followed by Ms. Pinkerton's meeting on February 27, 2003, with Mr. Gabel and Ms. Miller to discuss the job transfer. To the surprise of Mr. Gabel and Ms. Miller, Ms. Pinkerton turned down the reassignment to Denver, asserting that her current job was "fine." Despite having told Mr. Gabel previously that she would be willing to go to Denver, Ms. Pinkerton claimed that she no longer wanted to work in Denver because it was too far away. Ms. Pinkerton reconfirmed this decision in an e-mail on March 3, 2003. Accordingly, Mr. Gabel formally requested on March 7, 2003, that disciplinary action resume against Ms. Pinkerton. Ms. Harding then scheduled an R-6-10 meeting for March 13, 2003. At the meeting, Ms. Pinkerton did not mention the sexual harassment, and only presented a few e-mails and letters in her own defense.

Events unfolded rapidly thereafter. On March 18, 2003, Ms. Harding learned from the EEO that Ms. Pinkerton's sexual harassment complaint might be justified and immediately removed Mr. Martinez as Ms. Pinkerton's supervisor. Three days later, on March 21, 2003, Ms. Harding received Mr. Trujillo's investigation report, which concluded that Mr. Martinez had in fact made the

inappropriate comments. Six days after that, on March 27, 2003, Ms. Harding notified Ms. Pinkerton that she had not adequately explained her performance problems and that her employment was terminated. Then, on April 1, 2003, Ms. Harding held an R-6-10 meeting with Mr. Martinez to address his violations of CDOT's sexual harassment policy. Six days later, on April 7, 2003, Ms. Harding demoted and reassigned Mr. Martinez (resulting in a salary reduction of approximately $1,100 per month), and required him to take a class on sexual harassment. Mr. Martinez apparently was reinstated to his prior position after about eight months.

After her termination, Ms. Pinkerton brought suit against CDOT, raising two claims for relief, namely, sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964. See 42 U.S.C. § 2000e-2(a); 42 U.S.C. § 2000e-3(a). The district court found that CDOT was not vicariously liable for the actions of Mr. Martinez because the sexual harassment did not culminate in any tangible employment action. Further, the district court found that CDOT was not vicariously liable because CDOT had proved by a preponderance of the evidence that it exercised reasonable care to prevent and correct promptly the sexually harassing behavior and that Ms. Pinkerton had unreasonably failed to take advantage of corrective opportunities provided by the employer. Pinkerton v. Colo. Dep't of Transp., 05-cv-01533-MJW-CBS, 2007 WL 3232601, at *11-12 (D. Colo. Oct. 31, 2007). The district court also rejected the retaliation claim

because it concluded that Ms. Pinkerton had failed to show that CDOT's proffered reason for her termination was pretextual.  Id. at *13-14.  Accordingly, the district court granted CDOT's motion for summary judgment.  Id. at *14.  Ms. Pinkerton now appeals.

## Discussion

We review the grant of summary judgment de novo and apply the same standard as the district court.  T-Mobile Cent., LLC v. Unified Gov't of Wyandotte County, 546 F.3d 1299, 1306 (10th Cir. 2008) (citing Timmerman v. U.S. Bank, N.A., 483 F.3d 1106, 1112 (10th Cir. 2007)).  Rule 56(c) of the Federal Rules of Civil Procedure instructs that summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); T-Mobile, 546 F.3d at 1306.  In making this determination, we "examine the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party."  T-Mobile, 546 F.3d at 1306 (citations omitted).  At this stage, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . .  The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.  However, "[w]here the

record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

A.      Title VII Sex Discrimination Claim

Pursuant to Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). An individual can make a claim of sex discrimination based on a hostile work environment, Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66-67 (1986), but in order to do so, "a plaintiff must show (1) that she was discriminated against because of her sex; and (2) that the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment." Medina v. Income Support Div., 413 F.3d 1131, 1134 (10th Cir. 2005); see EEOC v. PVNF, L.L.C., 487 F.3d 790, 798 (10th Cir. 2007). Because CDOT does not argue for summary judgment purposes that Mr. Martinez's comments did not create a hostile work environment, the only question before us is whether CDOT is vicariously liable for that environment.

An employer may be vicariously liable[3] to a victimized employee for an

_____

[3] An employer can also be found directly liable for a supervisor's

(continued...)

-10-

actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee in either of two situations. Penn. State Police v. Suders, 542 U.S. 129, 143-46 (2004); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998).  First, the employer is vicariously liable when "the supervisor's harassment culminates in a tangible employment act, such as discharge, demotion, or undesirable reassignment." Ellerth, 524 U.S. at 765.  In that situation, the employer has no affirmative defense available. Id.  Second, an employer may be vicariously liable for a hostile work environment, even absent a tangible employment action.  However, in that circumstance, the employer will not be liable if it proves the following affirmative defense by a preponderance of the evidence: (1) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (2) the plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Id.; see Faragher, 524 U.S. at 807.

1.      Tangible Employment Action

Ms. Pinkerton contends that the Ellerth/Faragher affirmative defense should

----

[3](...continued) actionable sexual harassment in certain instances, including when the supervisor engaged in the harassment with the purpose of serving the employer or when the supervisor's high rank makes him the employer's alter ego. See Harrison v. Eddy Potash, Inc., 158 F.3d 1371, 1374-75 (10th Cir. 1998).  However, Ms. Pinkerton does not argue that CDOT is directly liable for Mr. Martinez's remarks.

not apply because the sexual harassment by her supervisor, Mr. Martinez, culminated in a tangible employment action, namely, her termination after having received poor evaluations from Mr. Martinez. Ms. Pinkerton's termination, if caused by Mr. Martinez, would certainly qualify as a tangible employment action, given that the Supreme Court defined that term to include "significant change[s] in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Ellerth, 524 U.S. at 761. Ms. Pinkerton argues that the fact she received relatively good evaluations in the years just prior to Mr. Martinez's becoming her supervisor shows that Mr. Martinez used the poor evaluations to "groom" her for sexual favors and then had her fired when she did not comply. As confirmation of this theory, Ms. Pinkerton points to the fact that she had net positive reviews during her first five years at CDOT but received net negative reviews under Mr. Martinez. Ms. Pinkerton also argues that Mr. Martinez caused Ms. Harding to fire Ms. Pinkerton under the subsidiary bias (or "cat's paw") theory. The district court rejected these arguments and found that the harassment did not culminate in the poor evaluations and termination. Pinkerton, 2007 WL 3232601, at *3. We agree. The undisputed facts would not lead a rational trier of fact to conclude that the harassment culminated in tangible employment action.

        a.     Grooming / Quid Pro Quo Argument

The undisputed facts do not allow for a reasonable inference that Mr.

-12-

Martinez was grooming Ms. Pinkerton for sexual favors. To survive summary judgment with a grooming / quid pro quo argument,[4] Ms. Pinkerton must show that a reasonable jury could find Mr. Martinez conditioned concrete employment benefits on her submission to sexual conduct and had her fired when she did not comply. Hicks v. Gates Rubber Co., 833 F.2d 1406, 1413-14 (10th Cir. 1987); see Conatzer v. Med. Prof'l Bldg. Svcs. Corp., 95 F. App'x 276, 279 (10th Cir. 2004) (unpublished). "The gravamen of a quid pro quo sexual harassment claim is that tangible job benefits are conditioned on an employee's submission to conduct of a sexual nature and that adverse job consequences result from the employee's refusal to submit to the conduct." Hicks, 833 F.2d at 1414. Here, as in Hicks, the record fails to support any suggestion that Ms. Pinkerton's employment was conditioned on sexual favors. See id. Ms. Pinkerton herself admitted that Mr. Martinez never asked for sex, and she even denied suggesting that Mr. Martinez sought to manufacture bad evaluations so that he would be able to sexually harass her.

Although Ms. Pinkerton argues that the mere fact her performance

---

[4] Of course, the Supreme Court has discouraged the categorical use of a "quid pro quo" theory as opposed to a "hostile work environment" theory. Ellerth, 524 U.S. at 753-54; see Rubidoux v. Colo. Mental Health Inst., 173 F.3d 1291, 1295-96 (10th Cir. 1999). We are not using the quid pro quo argument in that manner. Rather, we use the "quid pro quo" terminology only insofar as it might be useful to show that the harassment culminated in a tangible employment action. Ellerth, 524 U.S. at 753-54.

-13-

evaluation changed from "net positive" to "net negative" under Mr. Martinez shows that she was being groomed for sexual favors, she never explains why this change was not warranted—and no reasonable trier of fact could escape Ms. Pinkerton's history of under-performance at CDOT. The undisputed evidence shows that Ms. Pinkerton was failing to comply with the objective performance criteria that Ms. Pinkerton wanted used for her evaluation. Even Ms. Pinkerton acknowledges that Mr. Martinez's objective evaluations were supported by documentation and were based in large part on the reports of other individuals. Ms. Pinkerton also received complaints directly from engineers about her performance, in addition to those that Mr. Martinez informed her about. Moreover, the record reflects that prior supervisors had identified performance issues like those that Mr. Martinez later identified—including co-worker relations, familiarity with procedures, timeliness, and prioritizing of tasks. Mr. Ellis, a neutral observer, also testified that Ms. Pinkerton's performance declined once she was transferred to Mr. Martinez's supervision.

In short, nothing more than speculation suggests that Mr. Martinez, the soon-to-be harasser, manufactured poor evaluations in order to "groom" the harassed individual for sexual favors and fired her when she did not comply. Rather, the evidence shows that multiple individuals observed that Ms. Pinkerton failed to meet her clearly established, objective IPOs in the months leading up to October 2002—at which time Ms. Pinkerton herself knew that her performance

had placed her job in jeopardy.  Thus, we do not have a situation where negative performance reviews, generated to secure sexual favors, "culminated" in a tangible employment action.

### b.	Subordinate Bias / Cat's Paw Argument

However, Ms. Pinkerton argues that we could find a tangible employment action on the basis of the subordinate bias theory.  "To prevail on a subordinate bias claim, a plaintiff must establish more than mere 'influence' or 'input' in the decisionmaking process.  Rather, the issue is whether the biased subordinate's discriminatory reports, recommendation, or other actions caused the adverse employment action." EEOC v. BCI Coca-Cola Bottling Co., 450 F.3d 476, 487 (10th Cir. 2006).  Because the plaintiff must demonstrate causation, "an employer can avoid liability by conducting an independent investigation of the allegations against an employee." Id. at 488.  In fact, we have stated that "simply asking an employee for his version of events may defeat the inference that an employment decision was . . . discriminatory." Id.  In applying this standard at the summary judgment stage, we ask first if the plaintiff has established a "genuine issue of material fact concerning the bias of the subordinate." Id.  Second, we ask if the plaintiff has established "genuine issues of material fact as to whether the proffered reason for the employment action is pretextual, which in a subordinate bias claim requires the plaintiff to demonstrate a causal relationship between the subordinate's actions and the employment decision." Id.

-15-

Ms. Pinkerton's claim fails both prongs of this standard. First, Ms. Pinkerton has failed to establish a genuine issue of material fact as to the bias of the subordinate. As noted above, Ms. Pinkerton presents absolutely no evidence whatever that Mr. Martinez's reports and evaluations were biased. The evaluations were supported by documentation, and many of the errors were reported to Mr. Martinez by other individuals. Moreover, as the uncontroverted evidence shows, Ms. Pinkerton's errors were significant and had been noted by prior supervisors. Ms. Pinkerton provides nothing other than speculation and counsel's argument to the contrary; and, of course, the argument of counsel is not evidence, and cannot provide a proper basis to deny summary judgment. See Hinds v. Sprint/United Mgmt. Co., 523 F.3d 1187, 1198 n.6 (10th Cir. 2008) (stating that, "[t]o avoid summary judgment, a party must produce specific facts showing that there remains a genuine issue for trial" and that "mere conjecture" is insufficient (internal quotations omitted)); see, e.g., Fritzsche v. Albuquerque Mun. Sch. Dist., 194 F. Supp. 2d 1194, 1206 (D.N.M. 2002).

Second, in addition to not establishing a genuine issue regarding bias, Ms. Pinkerton also failed to demonstrate a causal relationship between Mr. Martinez's actions and Ms. Harding's employment decision. Ms. Harding met with Ms. Pinkerton for an R-6-10 hearing prior her termination. At the meeting, Ms. Harding asked Ms. Pinkerton if there was anything else she needed to know before making her decision, but Ms. Pinkerton did not dispute the negative

performance evaluations or *even raise* the issue of sexual harassment. Ms.

Harding's request that Ms. Pinkerton give her side of the story is sufficient to

defeat any inference that the decision was based on a subordinate's bias. BCI

Coca-Cola Bottling Co., 450 F.3d at 488; see Kendrick v. Penske Transp. Svcs.,

Inc., 220 F.3d 1220, 1231-32 (10th Cir. 2000).

Because Ms. Pinkerton's termination cannot be traced back to Mr. Martinez

through the subordinate bias theory, we cannot conclude that his actions

culminated in her termination. Accordingly, CDOT is not vicariously liable for

the hostile work environment that Mr. Martinez created. Instead, CDOT can

assert the Ellerth / Faragher affirmative defense. See Ellerth, 524 U.S. at 765;

Faragher, 524 U.S. at 807.

2.      *Ellerth / Faragher* Affirmative Defense

As noted earlier, the affirmative defense recognized by Ellerth and

Faragher "comprises two necessary elements: (a) that the employer exercised

reasonable care to prevent and correct promptly any sexually harassing behavior,

and (b) that the plaintiff employee unreasonably failed to take advantage of any

preventive or corrective opportunities provided by the employer or to avoid harm

otherwise." Gunnell v. Utah Valley State Coll., 152 F.3d 1253, 1261 (10th Cir.

1998). The district court concluded that CDOT met its burden of proof under the

Ellerth / Faragher affirmative defense. Pinkerton, 2007 WL 3232601, at *11-12.

We also conclude that summary judgment was properly granted to CDOT on this

-17-

issue.

a.    First Element of the *Ellerth* / *Faragher* Affirmative Defense

First, the uncontroverted evidence shows that CDOT exercised reasonable care to prevent and correct promptly Mr. Martinez's sexually harassing behavior. The parties do not seriously contest whether CDOT unreasonably failed to prevent sexual harassment. CDOT had in place an adequate sexual harassment policy. CDOT's policy prohibits sexual harassment, identifies the complaint procedure, and informs employees that disciplinary action might be taken against those who violate the policy. In addition to having adopted the sexual harassment policy, CDOT requires its employees to take a four-hour sexual harassment course, which identifies what behavior constitutes harassment and highlights the employee's obligation to report harassment.

However, the existence of a sexual harassment policy and training alone does not satisfy the employer's burden under the first prong of the Ellerth / Faragher defense because the employer not only must take reasonable care to prevent sexually harassing behavior but also to correct promptly any such behavior. See Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 807; see also Hurley v. Atl. City Police Dep't, 188 F.3d 95, 118 (3d Cir. 1999). CDOT's actions reflected reasonable care to promptly correct Mr. Martinez's behavior. Mr. Trujillo immediately began his investigation once Ms. Pinkerton submitted her complaint on February 24, 2003. On March 18, 2003, when Ms. Harding

-18-

learned from the EEO that Ms. Pinkerton's sexual harassment complaint might be justified, she immediately removed Mr. Martinez as Ms. Pinkerton's supervisor. Ms. Harding received Mr. Trujillo's investigation report on March 21, 2003; held an R-6-10 hearing with Mr. Martinez on April 1, 2003; and demoted and reassigned him six days later on April 7, 2003. In other words, CDOT removed Mr. Martinez as supervisor before the investigation was complete and demoted him roughly two weeks after the final investigative report. These facts demonstrate that CDOT acted promptly to resolve the harassment issue.

Ms. Pinkerton, however, argues that CDOT acted unreasonably by failing to remove Mr. Martinez from his supervisory position over her upon her first complaint. In certain circumstances, an employer's failure to remove a supervisor from close working proximity with a subordinate who has alleged sexual harassment against that supervisor might be seen as unreasonable. But here a number of factors persuade us that no reasonable factfinder could see CDOT as dilatory. The alleged harassment took the form of oral statements (not physical abuse) that ceased—without resuming—after Ms. Pinkerton's complaint; Ms. Pinkerton herself did not request separation from the supervisor; CDOT promptly launched an investigation; and the matter was conclusively resolved in a matter of weeks. Given CDOT's quick and effective[5] action on Ms. Pinkerton's complaint,

_____

[5] Ms. Pinkerton, relying on Gunnell, argues that the fact the harassment
(continued...)

-19-

we see no genuine issue left for trial about the reasonableness of CDOT's response.

> b. <u>Second Element of the *Ellerth* / *Faragher* Affirmative Defense</u>

Having found that CDOT did carry its burden with regard to the first element of the affirmative defense, we must turn to the question of whether Ms. Pinkerton unreasonably failed to avail herself of the preventive or corrective opportunities afforded her. "Following <u>Ellerth</u> and <u>Faragher</u>, the plaintiff who alleges no tangible employment action has the duty to mitigate harm, but the defendant bears the burden to allege and prove that the plaintiff failed in that regard." <u>Suders</u>, 542 U.S. at 152. CDOT argues that Ms. Pinkerton's failure to report the incidents for two months was unreasonable because she acknowledged having read CDOT's harassment policy and yet never availed herself of the numerous opportunities to report the incidents at her many meetings with Ms. Miller, Ms. Harding, or Mr. Gabel. We believe that CDOT carried its burden, given that CDOT has shown a reporting delay of approximately two or two and a half months (the harassment began in December but Ms. Pinkerton made no

<hr>

[5](...continued) ceased after the complaint does not demonstrate that CDOT acted promptly to remedy the harassment. Aplt. Br. 35. However, <u>Gunnell</u> does not speak to the <u>Ellerth</u> / <u>Faragher</u> affirmative defense and the question of whether the employer took reasonable steps to stop the harassment. <u>Gunnell</u>, 152 F.3d at 1261 (remanding for the district court to examine the claims in light of the then-newly issued <u>Ellerth</u> and <u>Faragher</u> opinions).

complaint until February 19, 2003) for which Ms. Pinkerton never offered any reason in her briefs on appeal.

The only explanation that finds any support in the record is the one suggested by Mr. Trujillo's report, namely, Ms. Pinkerton's expressed "fear that Mr. Martinez would retaliate against her." However, we note that many of our sister circuits have stated that a generalized fear of retaliation simply is not sufficient to explain a long delay in reporting sexual harassment. See Thornton v. Fed. Express Corp., 530 F.3d 451, 457 (6th Cir. 2008) (two month delay); Williams v. Missouri Dep't of Mental Health, 407 F.3d 972, 976 (8th Cir. 2005) (four month delay); Walton v. Johnson & Johnson Svcs., Inc., 347 F.3d 1272, 1277, 1290-91 (11th Cir. 2003) (approximately two and a half month delay); Casiano v. AT&T Corp., 213 F.3d 278, 280-81, 287 (5th Cir. 2000) (approximately four month delay); see also Barrett v. Applied Radiant Energy Corp., 240 F.3d 262, 268 (4th Cir. 2001) (discussing why the generalized fear of retaliation is insufficient); Shaw v. AutoZone, Inc., 180 F.3d 806, 813 (7th Cir. 1999) (same). The rationale behind Title VII compels us to agree. The "primary objective" of Title VII "is not to provide redress but to avoid harm." Faragher, 524 U.S. at 806. To promote this objective of avoiding harm, Title VII in general, and the Ellerth / Faragher defense in particular, is premised on a cooperative framework wherein the employee reports sexual harassment and the employer remedies the improper conduct. "[T]he law against sexual harassment

-21-

is not self-enforcing and an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists." Shaw, 180 F.3d at 813 (internal quotation marks omitted). It is undeniable that raising problems regarding sexual harassment can be uncomfortable for the employee, but if we were to allow an employee's subjective, ungrounded fears of unpleasantness or retaliation to alleviate an employee's reporting requirement, we would "completely undermine Title VII's basic policy 'of encouraging forethought by employers *and* saving action by objecting employees.'" Barrett, 240 F.3d at 268 (quoting Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 764). This case provides a good example of why we ought to encourage saving action by employees, given that once Ms. Pinkerton did complain, the harassment stopped. Had CDOT been notified earlier, there is a good chance that Title VII's primary goal of preventing harm would have been served.

In this case, the lapse of time was not vitiated by the fact that the events giving rise to the complaint were relatively minor. If that were the situation presented here, then a two or two and a half month delay might be reasonable, because an employee should not necessarily be expected to complain to management immediately after the first or second incident of relatively minor harassment. We will not require plaintiffs to report individual incidents that are revealed to be harassment only in the context of additional, later incidents, and

that only in the aggregate come to constitute a pervasively hostile environment. However, far from involving minor incidents, this case involves inappropriate comments that were perceived by Ms. Pinkerton to be so serious that she felt physically ill upon the first instance. What is more, because it is undisputed that Ms. Pinkerton had received the harassment training and knew that the incidents should have been reported, we find no adequate excuse for her delay there. Nor is Ms. Pinkerton's delay explained by the fact that she felt she could deal with the situation and compel Mr. Martinez to stop his inappropriate comments without having to appeal to higher authorities; the record on appeal simply does not support such an argument. Accordingly, we must conclude that CDOT has shown that Ms. Pinkerton's unexplained delay in reporting the harassment was unreasonable.[6]

B.    Title VII Retaliation Claim

In addition to prohibiting sexual harassment, Title VII contains an anti-retaliation provision that forbids an employer from discriminating against an individual because that individual "has opposed any practice made an unlawful employment practice" by Title VII or because that individual "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding,

---

[6] This conclusion is consistent with our unpublished decision in Conatzer. In that case, we found an unexplained delay of three weeks to be unreasonable where the victim knew of her duty to report the harassment (like Ms. Pinkerton). Conatzer, 95 F. App'x at 281.

or hearing" pursuant to Title VII.  42 U.S.C. § 2000e-3(a); see Timmerman, 483 F.3d at 1122.  Where the plaintiff seeks to prove a Title VII retaliation claim through indirect or circumstantial evidence, the burden-shifting analysis of McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973), applies.  Montes v. Vail Clinic, Inc., 497 F.3d 1160, 1176 (10th Cir. 2007).  "To establish a prima facie case of retaliation, a plaintiff must demonstrate (1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action."  Argo v. Blue Cross and Blue Shield of Kansas, Inc., 452 F.3d 1193, 1202 (10th Cir. 2006); see Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67-70 (2006); Montes, 497 F.3d at 1176.  Once the plaintiff has made out a prima facie case, the employer must "articulate a legitimate, nondiscriminatory reason for the adverse employment action."  Meiners v. Univ. of Kan., 359 F.3d 1222, 1229 (10th Cir. 2004).  If the employer articulates a legitimate reason for the action, then the plaintiff must demonstrate that the employer's asserted reasons are pretextual.  Id.

In this case, for the purposes of summary judgment, CDOT did not dispute that Ms. Pinkerton could establish a prima facie case of retaliation.  In turn, Ms. Pinkerton does not—nor could she—dispute that CDOT proffered a legitimate reason for her termination, namely, her poor work performance.  See Metzler v.

Fed. Home Loan Bank of Topeka, 464 F.3d 1164, 1172 (10th Cir. 2006) (stating that poor job performance is a legitimate, nonretaliatory reason for termination). Therefore, the only question before this court is whether Ms. Pinkerton has shown "that there is a genuine dispute of material fact as to whether [CDOT's] explanations for terminating her employment are pretextual." Metzler, 464 F.3d at 1172; Randle v. City of Aurora, 69 F.3d 441, 451 (10th Cir. 1995).

To establish a genuine issue as to pretext, Ms. Pinkerton must demonstrate that CDOT's "proffered non-discriminatory reason is unworthy of belief." Randle, 69 F.3d at 451. Ms. Pinkerton can meet this standard by producing evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Argo, 452 F.3d at 1203 (quoting Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997)) (internal quotation marks omitted). To establish a genuine issue regarding whether CDOT's proffered reason was pretextual, Ms. Pinkerton points to the temporal proximity between her protected activity and her termination, Ms. Harding's allegedly weak reasons for firing Ms. Pinkerton, and the attempt to get Ms. Pinkerton a new job. However, this evidence does not show weaknesses, implausibilities, or inconsistencies in CDOT's proffered reason for Ms. Pinkerton's termination.

-25-

First, Mr. Gabel's and Ms. Harding's attempt to get Ms. Pinkerton another job does not support an inference that the poor job evaluations were just a pretext for her termination. The undisputed facts show that a data entry position, the job that Ms. Harding found for Ms. Pinkerton, was much more suited to Ms. Pinkerton's abilities than her position as an AA II. She had held such a job for ten years prior to becoming an AA I, and the only poor reviews that appear on the record before us involve Ms. Pinkerton's work as an AA II and AA III. Moreover, the mere fact that Ms. Harding was nice enough to try to help Ms. Pinkerton find another job does not support the inference that she actually believed that Ms. Pinkerton's performance was adequate and that, ergo, her later justifications were pretextual. To the contrary, finding another position is perfectly compatible with the idea that Ms. Pinkerton's job performance was inadequate; it is not at all unusual for a department to attempt to transfer an under-performing employee. As this case demonstrates, doing so is much simpler than firing an employee because one is less likely to get sued. Moreover, it would be counter-productive to use the fact that Ms. Harding was trying to be helpful to Ms. Pinkerton as proof that she was retaliating against her. Accordingly, contrary to Ms. Pinkerton's argument, the fact that Ms. Harding tried to help Ms. Pinkerton find a job does not point out any inconsistencies or weaknesses in CDOT's asserted reason for Ms. Pinkerton's termination.

Second, Ms. Pinkerton ignores the undisputed evidence when she suggests

-26-

that Ms. Harding's testimony casts doubt on CDOT's reason for terminating Ms. Pinkerton's employment. Ms. Pinkerton seizes upon Ms. Harding's testimony that Ms. Pinkerton was fired because of "typographical errors" in her work, as demonstrating pretext. Apparently, Ms. Pinkerton is arguing that these errors were not significant enough to warrant termination. However, it is uncontroverted that Ms. Pinkerton spent months failing to comply with the objective IPOs established in her settlement agreement with CDOT—some of which limited the number of typographical errors she was permitted to make—and that she wanted CDOT to use in evaluating her. Therefore, Ms. Harding's comments regarding Ms. Pinkerton's typographical errors are perfectly consistent with CDOT's asserted reason for the termination. We are in no position to state that the numerous documented failures by Ms. Pinkerton were not serious enough to justify termination. See Jones v. Barnhart, 349 F.3d 1260, 1267 (10th Cir. 2003) (stating that the court should not "act as a super personnel department that second guesses employers' business judgments" (internal quotations omitted)).

Given that Ms. Pinkerton's first two arguments do not support a finding of pretext by highlighting some weakness or inconsistency with CDOT's explanation, we are left with the temporal proximity argument. Ms. Pinkerton points out that, instead of firing her in October 2002, CDOT fired her on March 27, 2003, about one month after she filed her complaint with Mr. Trujillo and only one week after the complaint was verified. However, this timeline is

-27-

incomplete; from November 7, 2002, when Ms. Pinkerton knew her job was in peril, until March 3, 2003, when she verified that she would not take the data entry position, CDOT was under the impression that Ms. Pinkerton was going to take another job.  It was only as of March 3, 2003, then, that CDOT had any reason to pursue further action against Ms. Pinkerton.  This greatly weakens any temporal relation between Ms. Pinkerton's complaint and her termination.  Regardless, temporal proximity alone is not sufficient to defeat summary judgment by showing that the employer's proffered reason is actually pretext for retaliation.[7]  Annett v. Univ. of Kan., 371 F.3d 1233, 1240 (10th Cir. 2004); Pastran v. K-Mart Corp., 210 F.3d 1201, 1206 (10th Cir. 2000).

Certainly, "[i]t is not the purpose of a motion for summary judgment to force the judge to conduct a 'mini-trial' to determine the defendant's true state of mind."  Randle, 69 F.3d at 453.  For summary judgment purposes, as "long as the plaintiff has presented evidence of pretext . . . upon which a jury could infer discriminatory motive, the case should go to trial."  Id.; see Anderson, 477 U.S. at

---

[7] Ms. Pinkerton draws our attention to language in Meiners stating that temporal proximity of six weeks "may be sufficient, standing alone, to show causation." 359 F.3d at 1231.  However, as the quoted language itself shows, our discussion in Meiners related to causation for purposes of establishing a prima facie case, and not whether it sufficed to demonstrate pretext at the third prong of the McDonnell-Douglas framework.  See Annett, 371 F.3d at 1240 (making the same argument about similar language in Ramirez v. Okla. Dep't. of Mental Health, 41 F.3d 584, 596 (10th Cir.1994)).  We have already distinguished these two different inquiries.  Annett, 371 F.3d at 1241.

-28-

249. However, Ms. Pinkerton did not present such evidence, and therefore has not established a genuine issue for trial on the retaliation claim.

Finally, we note that a recurrent theme in Ms. Pinkerton's briefs is that her claim of discrimination and retaliation should not depend upon her being a model employee. We agree that Title VII protects all employees from discrimination, notwithstanding the quality of the employee's job performance. At the same time, an employer is entitled to raise defenses, including that the termination was justified by the employee's under-performance or, in the case of hostile work environment sexual harassment, that the employee did not promptly take advantages of remedial mechanisms. We have applied the law within this framework in reaching the conclusion that Ms. Pinkerton failed to show pretext and a reason for her delay in complaining of sexual harassment.

AFFIRMED.

Pinkerton v. Colorado Department of Transportation, 04-1494

**EBEL**, J., dissenting:


I respectfully dissent because I believe there is enough evidence in this case to raise genuine issues of fact as to (1) whether CDOT is entitled to the Ellerth/Faragher affirmative defense on Ms. Pinkerton's claim for a hostile work environment, and (2) whether CDOT's firing of Ms. Pinkerton was in retaliation for her filing a complaint with CDOT's internal Equal Opportunity Office.


I.  Sexual Harassment Claim

Generally, "[a]n employer is subject to vicarious liability . . . for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee."  Burlington Indus. Inc. v. Ellerth, 524 U.S. 742, 765 (1998);  Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998).   In Ellerth and Faragher, the Supreme Court established an affirmative defense allowing an employer to avoid liability on a hostile work environment claim when no tangible employment action is taken against the plaintiff.  See Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 807.  The Ellerth/Faragher affirmative defense "comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by

the employer or to avoid harm otherwise." Gunnell v. Utah Valley State Coll., 152 F.3d 1253, 1261 (10th Cir. 1998) (emphasis added; quotation omitted). If a genuine issue of fact exists as to either element, then Pinkerton is entitled to a trial on the merits of her hostile work environment claim.

Even if CDOT can satisfy the first element of the Ellerth/Faragher affirmative defense, as the majority contends, CDOT can not show an absence of a genuine issue of fact as to the second. As the Court of Appeals for the D.C. Circuit has correctly recognized,

> [the second element of the affirmative defense] is not intended to punish the plaintiff merely for being dilatory. Rather, it "reflects an . . . obvious policy imported from the general theory of damages," namely, that the victim has a duty to mitigate her damages. "If the victim could have avoided harm, no liability should be found against the employer who had taken reasonable care, and . . . no award against a liable employer should reward a plaintiff for what her own efforts could have avoided."

Greene v. Dalton, 164 F.3d 671, 674 (D.C. Cir. 1999) (quoting Faragher, 524 U.S. at 806-07) (citation omitted).

When the initial incidents of harassment constitute low-level harassment, which, standing alone, may not trigger Title VII hostile work environment liability, the failure to report at that stage is not necessarily unreasonable. See, e.g., Reed v. MBNA Mktg. Sys., Inc., 333 F.3d 27, 36-37 (1st Cir. 2003) (genuine issue of fact existed over whether failure to report was reasonable after two months of mildly harassing comments); Watts v. Kroger Co., 170 F.3d 505, 510-

11 (5th Cir. 1999) (holding that, even though some sexual harassment occurred in 1993, it intensified in the spring of 1994 and a jury could find that waiting to complain until July 7, 1994, was not unreasonable as a matter of law). Ultimately, "[t]here is no bright-line rule as to when a failure to file a complaint [as a result of harassing conduct] becomes unreasonable." Reed, 333 F.3d at 35. Instead, to determine reasonableness, an employee's response to harassing conduct must be determined by reference to many factors: for example, the length of time that elapsed before filing the complaint, the nature of the harassment and particularly the initial stages of the harassment, the accessibility and efficacy of a mechanism for reporting and resolving complaints of sexual harassment, and the plaintiff's own efforts to stop or avoid escalation of the harassment short of filing a complaint under the defendant's reporting mechanism.

At this stage of the proceedings, a genuine issue of fact exists over whether Ms. Pinkerton timely complained to CDOT's internal civil rights office regarding Mr. Martinez's harassing comments. Because CDOT has the burden of establishing both prongs of the Ellerth/Faragher defense, and it has not established that there is no genuine dispute as to the second prong, CDOT should not be entitled to summary judgment based upon its Ellerth/Faragher defense.

As the majority opinion details, Mr. Martinez's first sexually inappropriate remarks to Ms. Pinkerton occurred during a "project ride" when they were alone in December 2002. (3 Aplt. App. 662.) Mr. Martinez asked whether she had

-3-

sexual urges and how she could be divorced for so long and live without men. (3 Aplt. App. 603, 609.) Ms. Pinkerton responded that Mr. Martinez's comments were personal questions and told him that he should not ask her such questions. (3 Aplt. App. 609.) The next comments were not until the next month, on January 6, 2003, when Mr. Martinez asked her about her breast size and commented to her about another man waving at her. (3 Aplt. App. 603.) A few days later, Mr. Martinez made more inappropriate comments, such as trying to tell her about a married woman who had "come on" to him. (3 Aplt. App. 603.) Ms. Pinkerton told him that she did not care to hear his story, and stopped the conversation. (3 Aplt. App. 603, 609, 667.) Sometime after these incidents, Mr. Martinez called Ms. Pinkerton into his office and tried to close the door. (3 Aplt. App. 603.) Ms. Pinkerton told him not to close the door because she felt uncomfortable. (3 Aplt. App. 603, 770.) Additionally, Mr. Martinez told Ms. Pinkerton that he liked it when she wore skirts and asked her if she masturbated and if she had breast enlargements, although it is not clear from the record when these comments occurred. (3 Aplt. App. 658, 667.) When Mr. Martinez brought up these sexually inappropriate topics, Ms. Pinkerton told him that these questions were personal. (3 Aplt. App. 663.)

Ms. Pinkerton contacted Mr. Eugene Trujillo, CDOT's internal civil rights administrator, and met him in his office on February 19, 2003, to report Mr. Martinez's harassment. (3 Aplt. App. 609, 664.) The next and final incident

happened later that week, when Mr. Martinez asked to go to Ms. Pinkerton's house for lunch. (3 Aplt. App. 603-04, 610.) Ms. Pinkerton responded to Mr. Martinez's attempt to have lunch at her house by rebuking him that no one from work ever comes to her house. (3 Aplt. App. 603.) On February 21, 2003, she contacted Mr. Trujillo again to recount this latest incident and inform him that she had decided to file a formal written complaint. (3 Aplt. App. 609, 663-64.) She subsequently filed a formal written complaint on February 24, 2003. (3 Aplt. App. 603-04.)

All of the above comments by Mr. Martinez were inappropriate and contributed to a hostile work environment. But a hostile work environment must be intolerable, and often it may take more than one inappropriate statement for the environment to become intolerable. See Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) (indicating that a Title VII plaintiff can establish actionable sexual harassment based upon "a single incident [of sexual harassment that] was extraordinarily severe"). While one statement may be sufficient in a given situation to constitute actionable harassment, id., here the first statement in December was not sufficient to create a hostile work environment. A hostile work environment might have been created by early January, but that might not have been clear to Ms. Pinkerton given that a month had gone by since the first incident. However, the hostile work environment became unequivocal when Mr. Martinez asked to go to her house for lunch. This incident reasonably could

-5-

have been interpreted as a request for Ms. Pinkerton to take concrete action on his advances, or as a request for quid pro quo.

On this record, a jury could conclude that when Ms. Pinkerton reported the harassment to CDOT's internal EO Office on February 19, 2003, and later when she filed a formal written complaint on February 24, 2003, she was acting in a timely manner because only then had it become reasonably apparent that she could not stop Mr. Martinez's inappropriate conduct toward her by her own expressed disapproval of his conduct, and only then had Mr. Martinez's conduct unambiguously created a hostile work environment. Therefore, a jury could ultimately conclude that her response to Mr. Martinez's harassment was timely.

## II. Title VII Retaliation Claim

In upholding the dismissal of Ms. Pinkerton's retaliation claim, the majority states that temporal proximity between protected conduct and adverse action is never enough by itself to create a genuine issue of fact on whether an employer's proffered reason for termination is pretextual. (Maj. opin. at 29.) For this proposition the majority relies on Annett v. Univ. of Kan., 371 F.3d 1233 (10th Cir. 2004), a case dealing with a plaintiff's claim that an employer's failure to hire her for a position was retaliatory. In my opinion, Annett's holding that temporal proximity alone is never sufficient to defeat summary judgment is limited to the failure-to-hire context in which that case arose.

It is a jury's function to determine whether an employer acted with a retaliatory motive, and it is not reasonable to contend that temporal proximity is never sufficient evidence for the jury to infer retaliation. Once a defendant has proffered a legitimate, non-discriminatory reason for the employment action, a plaintiff assumes the "normal burden of any plaintiff to prove his or her case at trial." EEOC v. Flasher Co., Inc., 986 F.2d 1312, 1316 (10th Cir. 1992). When the temporal proximity is dramatic, as it is here, the plaintiff should have the opportunity to argue her case to the jury and attempt to cross-examine the defendant to discredit the defendant's explanation for the employment decision.

A failure-to-hire situation is very different because, in that context, an employer has failed to do something — i.e., failed to hire or promote the plaintiff. A failure to act presents many of the problems normally associated with proving a negative. It is also harder to tie a failure to act to a precise time period. Finally, inaction is inherently more ambiguous than action. Thus, it may have been appropriate in Annett for our court to conclude that mere temporal proximity is not enough *by itself* to go to the jury on the issue of retaliatory motive in a failure-to-hire case.

But here we have quite a different situation. We have an affirmative act, which was discrete in time and which was unambiguous. When Ms. Pinkerton filed her complaint with her employer, she was fired within days of its verification. The jury may, or may not, believe her employer's explanation of

why the firing occurred so close to Ms. Pinkerton's complaint, but that is for the jury to decide.

In any event, here Ms. Pinkerton has offered other evidence, which, in connection with the evidence of temporal proximity, raises an issue of material fact as to whether Ms. Harding's proffered reason for termination — poor job performance — is unworthy of belief.  See Pastran v. K-Mart Corp., 210 F.3d 1201, 1206 (10th Cir. 2000) (evidence of temporal proximity in combination with other evidence of pretext is sufficient to defeat summary judgment).  First, Ms. Harding testified that the most serious error leading to Ms. Pinkerton's termination was an allegedly mishandled call from an employee's daughter that occurred approximately four years before her termination.  (3 Aplt. App. 645-46.) Second, Ms. Harding attempted to get Ms. Pinkerton another placement within CDOT only months before she was fired.  A reasonable jury could conclude that the very close temporal proximity in this case between her complaint and her termination, along with the doubt that these incidents raise about the bona fides of Ms. Harding's justification for Ms. Pinkerton's termination, establishes that CDOT's proffered explanation for Ms. Pinkerton's discharge is unworthy of credence.   Each case turns on its facts, and when, as here, the temporal proximity is very close, and when there is also credible doubt about the plausibility of an employer's proffered reason for adverse action, there is sufficient evidence to

create a genuine issue of fact on a plaintiff's claim, and those issues should be resolved by a jury.